**STATE of Delaware, ex rel. Charles M. OBERLY, III, Attorney General, Lawrence J. Corrado and South Inlet Mobile Home Park Tenants' Association, Inc., a corporation of The State of Delaware, Plaintiffs,**

v.

**Joseph Henry SIMPSON and Abraham Al-Arnasi, Defendants.**

**Civ. A. No. 899.**

Court of Chancery of Delaware, Kent County.

Submitted: Jan. 22, 1988.
Decided: April 19, 1988.

William W. Erhart, Dept. of Justice, Wilmington, for plaintiff-State of Del.

Christopher J. Curtin, and John J. Schreppler, II, Sawyer & Akin, P.A., Wilmington, for plaintiff-South Inlet Mobile Home Park Tenants' Assn.

Robert L. Halbrook, Wilson, Halbrook & Bayard, Georgetown, for defendants.

HARTNETT, Vice Chancellor.

Plaintiffs brought this action seeking to temporarily and permanently enjoin the sale of the South Shore Inlet Trailer Park in Sussex County ("Trailer Park") and to compel the prospective purchaser of the Trailer Park to comply with the Delaware Conversion of Mobile Home Properties Act, 25 *Del.C.*, Ch. 71 ("Act") which regulates the conversion of a mobile home park into multi-unit dwellings. Both the plaintiffs and the defendants have moved for partial summary judgment on the issue of whether the Act applies to this Trailer Park.

I find that both the definition of a mobile home park and the purpose of the statute, as set forth in the Act, preclude the Trailer Park from being covered by the Act and, therefore, the provisions of the Act do not apply to it. Defendants' motion for partial summary judgment on this issue therefore must be granted and plaintiffs' cross-motion denied.

I

The essential facts are not disputed. From 1955 to 1966, John A. Marsh owned the Trailer Park which consists of 86 lots that are leased to various tenants for use as mobile home sites. He operated the park as a seven month summer vacation resort. In 1966, Mr. Marsh conveyed the Trailer Park to defendant Joseph Henry Simpson. Mr. Simpson also continued to maintain the Trailer Park as a vacation resort and he also operated the park for

only seven months each year, opening early in April and closing early in November. During the seven months of operation, water and sewer services were provided to the tenants through an underground system. From November to April, however, Mr. Simpson would shut down the water and sewerage utilities, as he feared that the uninsulated water lines would freeze. With the exception of one insulated water line, all water lines were shut off. Likewise, Mr. Simpson always turned off, during the five-month off-season, the electricity which operated the electric sump pump in the septic tank which held the sewage from the entire Trailer Park. Due to the saturated soil surrounding the Trailer Park, increased sewage caused by a year-round usage of the Trailer Park would be unsanitary and possibly illegal. Thus, both water and sewage disposal services were not provided to the Trailer Park tenants from November 1 to April 1 of each year.

The other utilities such as telephone, electricity and propane gas, were available directly to the mobile home owners from utility and service companies on a year-round basis.

On April 3, 1985, Mr. Simpson contracted to sell the Trailer Park to defendant Abraham Al–Arnasi. Mr. Al–Arnasi intended to convert the Trailer Park into multi-unit condominiums. At the time of the execution of the contract of sale, there were 86 tenants leasing mobile home sites in the Trailer Park. Only one of the tenants, who was provided with an insulated water line, remained on the property year-round.

On March 11, 1986, plaintiffs Lawrence J. Corrado, a tenant in the Trailer Park, and South Inlet Mobile Home Park Tenants' Association filed a suit seeking to enjoin the sale of the Trailer Park, claiming rights arising under a lease by estoppel theory and alleging the failure of the Seller and Buyer to comply with The Delaware Conversion of Mobile Home Properties Act. On April 2, 1986, the Delaware Attorney General also filed a suit seeking to enforce the requirements of The Delaware Conversion of Mobile Home Properties Act. The suits were consolidated in this Court on June 3, 1986.

On June 12, 1986, I granted plaintiffs' application for a preliminary injunction finding that the plaintiffs would likely suffer irreparable harm if the Trailer Park was sold and leases terminated after one year. *State et al. v. Simpson et al.*, Del. Ch., C.A. No. 899–K, Hartnett, V.C. (June 12, 1986) [available on WESTLAW, 1986 WL 6836]. My opinion, however, did not address the legal issues concerning the applicability of The Delaware Conversion of Mobile Home Properties Act.

By stipulated order dated December 22, 1986, pursuant to an agreement between the parties, I permitted the consummation of the sale of the Trailer Park to defendant Al–Arnasi, with the agreement that the settlement would not affect the legal rights of the parties.

It is undisputed that, with the exception of one year-round tenant, all of the tenants have other places to live other than in the Trailer Park and do so for at least five months of the year.

## II

This Court may grant summary judgment when the moving parties have clearly demonstrated an absence of any genuine issue of material fact and that they are entitled to summary judgment as a matter of law. *Bershad v. Curtiss–Wright*, Del. Supr., 535 A.2d 840 (1987); *Nash v. Connell*, Del.Ch., 99 A.2d 242 (1953). Partial summary judgment may be granted as to any issue in which the moving party has clearly proven an absence of any genuine dispute of material fact. Chancery Rule 56(a)(b).

## III

The only issue presented by the cross-motions for partial summary judgment is whether the Trailer Park is covered by The Delaware Conversion of Mobile Home Properties Act. 25 *Del.C.*, Ch. 71. The other issue of lease by estoppel is not raised in the motions.

25 *Del.C.* § 7102(5) defines a mobile home park:

> "Mobile home park" shall mean any mobile home or trailer park *designed to house mobile homes which are served by utilities on a year-round basis.* This chapter shall not apply to a park or camp devoted to recreational vehicles which move to the site under their own power or can be towed to the site by an automobile. (emphasis added)

Delaware courts have long followed the general rule of statutory construction "that where the language of a statute is plain and conveys a clear and definite meaning, the courts will give to the statute the exact meaning conveyed by the language, adding nothing thereto, and taking nothing therefrom." *Federal United Corporation v. Havender,* Del.Supr., 11 A.2d 331, 337 (1940), citing, *VanWinkle v. State,* Del. Supr., 91 A. 385 (1916); See also *Daniels v. State,* Del.Supr., 538 A.2d 1104 (1988); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.,* Del.Supr., 492 A.2d 1242 (1985); *Williams v. West,* Del.Supr., 479 A.2d 1253, 1255 (1984). Moreover, "a statute can define its terms as the lawmakers see fit in order to make clear what is intended." *Stiftel v. Malarkey,* Del.Supr., 384 A.2d 9, 11 (1977).

25 *Del.C.* § 7102(5) states a clear and unambiguous legislative definition of a mobile home park. In order for a mobile home park to fall within the protections afforded by the Act it must be "... designed to house mobile homes which are served by utilities on a year-round basis".

The words "mobile homes" are in the plural, thereby requiring that there must be more than one mobile home served by utilities on a year-round basis. See *State ex rel. Foulger v. Layton,* Del.Supr., 194 A. 886 (1937).

"Utilities" means "something useful to the public, especially the service of electric power, gas, water, telephone, etc." *Webster's New 20th Century Unabridged Dictionary,* The World Publishing Co., N.Y. (1965). "Utilities" has also been defined as "a unit composed of one or more pieces of equipment usually connected to or part of a structure and designed to provide a service (as heat, light, power, water or sewage disposal)." *Webster's Third New International Dictionary Unabridged,* G. & C. Merriam Company, Springfield, Mass. (1981).

Plaintiffs assert that the word "served," as used in the statutory definition, includes a capability to serve. "Served", however, means "to provide services that benefit or help, to furnish or supply with something needed or desired". *Webster's New Collegiate Dictionary,* G. & C. Merriam Company, Springfield, Mass. (1976). Thus, the common meaning of "served" requires that the utilities must be actually supplied. Even assuming, arguendo, that the word "served" could mean "capable of serving", the present record indisputably shows that, due to soil saturation and uninsulated water lines, the Trailer Park could not be served with water and sewer utilities on a year-round basis without a reconstruction of those facilities.

The provisions of 25 *Del.C.* § 7102(5) also require that in order for the Trailer Park to come within the limitations imposed by the Act the mobile homes within it must be served by utilities "on a year-round basis". The unambiguous meaning of "year-round" is "effective, employed, or operating for the full year". *Webster's New Collegiate Dictionary,* supra.

As previously noted, it is not disputed that water and sewerage services are being provided only to one mobile home in the Trailer Park on a year-round basis and of the 86 tenants in the Trailer Park, the other 85 tenants receive water and sewerage services for only seven months a year. It is also not disputed that, as the Trailer Park is presently designed, water and sewer services cannot be furnished during the five cold months of the year. As the plaintiffs concede, this condition has existed since 1969. The tenants are also aware of the lack of year-round water and sewer service and accordingly live in their other homes during the off-season. As all but one tenant has acknowledged, the Trailer Park is a vacation resort and the tenants have other homes as permanent residences.

The Trailer Park therefore is not a mobile home park as defined by the Act and the provisions of the Act do not apply to it.

## IV

The definition of "mobile home park" as set forth in 25 *Del.C.* § 7102(5) is consistent with the stated purpose of The Delaware Conversion of Mobile Home Properties Act as set forth in 25 *Del.C.* § 7101:

> "This chapter is designed to protect and enhance the welfare of the citizens of Delaware by preserving the availability of mobile home rental units. *An emergency situation exists with respect to housing for Delaware citizens,* many of them elderly, in mobile home parks intending to convert into multiple-unit usage. This chapter provides a procedure for the orderly transition of a mobile home park from single unit rental to multi-unit usage. *Without the procedure established herein, tenants of mobile home parks may be deprived of any suitable areas in which to live."* (emphasis added)

The General Assembly's intent, as clearly stated in 25 *Del.C.* § 7101, is to protect those Delaware mobile home park tenants who would otherwise "... be deprived of any suitable areas in which to live" upon the conversion of a trailer park into use for multi-unit dwellings. The General Assembly, in enacting a definition of a mobile home park which limits the coverage of the Act to year-round parks, acted consistently with the stated purpose of the Act which is to prevent tenants of mobile home parks from being deprived of a place to live. It was not the purpose of the Act, as expressed in the language of 25 *Del.C.* § 7101, to impose restrictions on seasonal vacation parks. Cf. *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

## V

In summary, I find that the definition of "mobile home park", as set forth in 25 *Del.C.* § 7102(5), does not, by its unambiguous terms, include a Trailer Park which provides water to its tenants for only seven months a year. Defendants' motion for partial summary judgment, therefore, is granted and I find that the Delaware Conversion of Mobile Home Properties Act does not apply to the Trailer Park in question. Plaintiffs' cross-motion for summary judgment on this issue is denied. IT IS SO ORDERED.

The other issue in this case: whether the tenants have a right to continue to occupy the lots they leased because of an alleged lease by estoppel, remains for future consideration.